## CANAL COMPANY *v.* RAY.

*The terms of a contract under seal may be varied by a subsequent parol agreement.*

APPEAL from the Supreme Court of the District of Columbia. The facts are stated in the opinion of the court.

*Mr. Richard T. Merrick* for the appellant.
*Mr. Walter D. Davidge* for the appellee.

MR. JUSTICE STRONG delivered the opinion of the court.

Assuming the facts to be such as are averred·in the bill, and not denied in the answer, we have this case: In 1860 the complainants were engaged in enlarging the machinery and capacity of their flouring mill, situate near the canal of·the defendants, between it and the Potomac River, and dependent for its power upon water obtained from the canal. While thus engaged it was agreed between them and the defendants that for a stipulated rent they should have full right, permission, and authority to draw from the canal, for the uses of their mill, so much water as would pass through an aperture 'of specified dimensions, in an iron plate not exceeding an half inch in thickness, on certain conditions. The first of these related to the form of the aperture and its capacity. The second was that the aperture should not be placed nearer the canal bottom proper than two feet. The third prohibited any attachment, contrivance, or device to increase the quantity of water that could be drawn through the aperture above what could be drawn if such device were not used. The fourth required that a sliding gate or gates should be placed in front of the aperture, so that the whole water-power granted might, as occasion under the provisions of the contract required, be entirely or partially stopped from passing through it. The fifth condition related to the construction of the forebay, the aperture and sliding gates, requiring them,. *inter alia*, to be put down, constructed, and thereafter kept in repair at the sole cost of the complainants, under the special direction and superintendence, and subject in every particular to the approval of such officer of the company

as might be charged with that duty. The sixth condition was that, in like manner, at the sole cost of the grantees or complainants, and under the special direction of the officers of the company charged with that duty, such alterations should be made from time to time in the forebay or trunks, cover, or bridge aperture, and sliding gate or gates as might be considered necessary by the company or their officers, *to prevent or lessen the inconvenience to the navigation of the canal and the use of its towing-path, which might be found to arise from said use of the water, or that might be thought necessary by the company for the greater security of the canal or of its works.* The seventh condition reserved to the company the right of full ingress and egress, by their officers, to and from the premises of the grantees for the purpose of examining, repairing, and preserving the fixtures and works connected with drawing off the water, repairing the embankment and other parts of the canal, and also for the purpose of ascertaining whether any defects existed in the fixtures and works for drawing off water, repairing the embankment and other parts of the canal, and also for the purpose of ascertaining whether any defects existed in the fixtures and works for drawing off water, occasioning leakage from the canal, or endangering its security and that of its works, and also for ascertaining whether more water was drawn off than was granted by the contract. The remaining conditions need not be noticed. They have no possible bearing upon the matter now in controversy.

Obviously this grant of the water privilege contemplated that the aperture, the trunk or forebay, and the sliding gate or gates should be constructed after the grant was made. To that extent the contract was executory. It did not expressly require that the aperture and guage should be located at the bank of the canal, in front of an opening there made, though probably such was the understanding of the parties. But conceding that it was, and that the contract in terms required such a location, it was nevertheless competent for the parties in the subsequent execution thereof to substitute another location in place of that first contemplated, and if such a change was made by mutual consent it amounted to a compliance with the provi-

sions of the contract. The company, after having accepted or acquiesced in a location of the aperture and gate at a point nearer the complainants' mill than the canal bank, could not afterwards complain that the condition respecting the location had not been performed, unless a right to require arbitrarily a change was reserved.

The bill avers that after the enlargement of the complainants' mill had been completed, the works for conducting the water from the canal to the mill, and for measuring the quantity of water granted by the contract, were constructed and located under the special direction of the engineer and superintendent of the canal company, the officers charged with the duty, and with their approval, and that with like approval the aperture or gauge, and sliding gate thereat, were constructed and located at the wheel of the complainants' mill, where they have since remained, having been repeatedly inspected and approved by the officers of the company. This averment is, at most, only evasively denied. The answer does indeed deny that the gauge and sliding gate were located at the wheel of the complainants' mill with the knowledge and consent of the company, and denies that such location was made with the approval or by the direction of the officers of the company, " *if it is meant by the averment* " (of the bill) " *to that effect that such arrangement was intended as permanent, or as other than a temporary indulgence.* " Such an equivocal denial cannot be considered as breaking the force of the complainants' allegation. Then, what is the effect of that averment? If, in executing the contract between the parties, the gauge and sliding gate were placed at the wheel of the mill with the knowledge of the company and with their consent, and if the location was thus made under the special direction of their engineer and superintendent, the officers charged with the duty; if for years the location remained unchanged and unchallenged, having been repeatedly inspected and approved by the company's proper officers, as averred in the bill and not denied, it would be grossly inequitable to hold that the location was not intended by both parties to be an execution of the contract, and accepted as such. Especially is this true when the location was made at the cost of the grantees of the water, and when, at the time when the works were

thus constructed and located, there was also placed at the opening of the forebay into the canal, as part and in consideration thereof, and at the cost of the grantees, a gate to enable the company to control the water-power granted, in accordance with the provisions of the grant. And it matters not that the company may not have intended such location of the gauge to be permanent, unless such was the understanding of both parties, which is not averred. There can be no doubt that a party to a contract imposing mutual obligations may accept, as performance by the opposite party, some other thing than that specifically designated; and if he does, he cannot afterwards insist upon exact performance. Nothing is more common than such fulfilment of contract obligations. In equity it is certainly regarded as sufficient fulfilment. In the present case the location of the aperture and sliding gate at the mill wheel, instead of at the canal bank, effectuated the leading purpose of the contract, which was to give the complainants a specified quantity of water; and the company was fully protected by an additional gate at the canal, at the entrance of the forebay, by which they were enabled conveniently to control the flow of water to the mill.

This, however, is not all the case. On the 23d of February, 1865, some other millers having preferred requests that they might be allowed to draw at the wheels of their mills the quantity of water leased to them by the canal company, the board of directors of the company adopted the following resolution: —

"*Resolved*, that the superintendent of the Georgetown division, under the direction of W. E. Smith, C. E., be directed to place the water-gauges for the mills at Georgetown at such point as may be deemed most advisable to effect the objects of the respective water grants, and to limit the flow of water to the quantity to which the lessees are severally entitled: *Provided*, that said lessees shall severally assent in writing that the officers of the company may, at all times, have free access to their premises for examination or regulation of such parts as may be constructed upon them; and provided further, that the board may, at any time during their pleasure, if they shall deem it necessary, alter or change the position of such gauge or gauges, or any of them, as contemplated by the

lease, and that this resolution shall not in any manner change or impair the provisions or requirements of the respective leases granted to said parties."

On the 25th of the same month the several millers, together with the complainants in this case, gave their written consent to the resolution, and requested that their water-guages should be placed upon their respective premises, at or near the water-wheel. This resolution (made a contract by the acceptance of its provisions) certainly cannot be construed so as to deprive the complainants of the right they had previously acquired. It was intended mainly for the benefit of the other millers whose water-guages were not located at the wheels of their respective mills. And though the complainants assented to it, and thus subjected themselves to the obligations prescribed, they did not thereby agree that the location of the gauge at their water-wheel might be changed at the pleasure of the company, without cause, or for any reasons except such as were specified in the grants of water to them. The proviso declared that the board of directors might alter or change the position of the gauge, "as contemplated by the lease." That means that the company reserved the same power to change the location which they had by the original contract. It stated expressly that the resolution should not in any manner change or impair the provisions or requirements of the respective leases granted to the parties. Now, what were the provisions of the leases, or contemplated by them, respecting changes in the position of the water-gauges? They are to be found in the sixth condition upon which the grants of water were made. They are that such alterations in the forebay or trunk, cover, or bridges, aperture, and sliding gate or gates, from time to time shall be made, as the company or their officer charged with that duty might consider necessary "to prevent or lessen the inconvenience to the navigation of the said canal, and the use of its towing path, which may be found to arise from the use of said water, or that may be thought necessary by the said company for the greater security of the said canal or of its works." No right was reserved to require such alterations arbitrarily, or for any other cause than one of those thus specified, and none to enforce such a requirement by stopping the flow of the water. It

is admitted here by stipulation that the company has no knowledge of abuses by the complainants of the privileges conceded to them by the resolution of February, 1865, necessitating a change of their gauge to the canal bank for the purpose of navigation, or in respect of the tow-path, or for the security of the canal or of its works. The change required, therefore, is without any cause that justifies a demand that it be made — without the existence of any circumstance that, by the conditions of the grant, authorized the company to enforce it.

It is said on behalf of the appellants that the contract of lease between the canal company and the complainants, being a sealed instrument, could not be changed by any instrument of a less formal nature. From this it is inferred that neither the action of the company's officers in 1860 nor the resolution of 1865 could change the provisions of the grant. It is admitted that the company could waive any conditions therein for the benefit of the grantors, — such as the condition that the guage should be at the canal bank, — but is insisted that such a waiver would amount to no more than a license, revocable at will. But were it conceded that the location of the gauge at the water-wheel of the complainants' mill was in pursuance of a mere license, the license, when followed by the expenditure of the licensee's money in the construction of the works, on the faith of it, became a contract irrevocable by the grantor. The case, however, does not rest on that ground. The location of the gauge in 1860, under the direction and with the approval of the officers of the company charged with the duty of directing and superintending its construction, was, as we have said, an execution of the contract in that regard and not an alteration of it. And if it was not an execution of the contract, the resolution of 1865, accepted by the complainants, was a contract on sufficient consideration, which the parties were competent to make. Notwithstanding what was said in some of the old cases, it is now recognized doctrine that the terms of a contract under seal may be varied by a subsequent parol agreement. Certainly, whatever may have been the rule at law, such is the rule in equity. *Dearborn* v. *Cross*, 7 Cow. (N. Y.) 48; *Le Fevre* v. *Le Fevre*, 4 Serg. & R. (Pa.) 241; *Fleming* v. *Gilbert*, 3 Johns. (N. Y.) 527. These are cases

at law. Numerous others might be cited. The rule in equity is undoubted.

The objections we have thus expressed lead directly to an affirmance of the decree rendered by the court below. In 1873, thirteen years after the gauge had been constructed at the water-wheel, the canal company required the complainants to place the gauge and sliding gate at the canal bank and threatened to shut off the water from the mill if the requirement was not complied with. The company had no right to make and had none to enforce such a requirement, except in the cases specified in the leases, and those cases have now no existence.

*Decree affirmed.*